In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2351

INDIANA FUNERAL DIRECTORS INSURANCE TRUST,
an Indiana Trust,

*Plaintiff-Appellant,*

*v.*

BENEFIT ACTUARIES, INCORPORATED,
a Michigan corporation,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 97 C 1248—**John Paul Godich,** *Magistrate Judge.*

———————

ARGUED FEBRUARY 28, 2008—DECIDED JUNE 24, 2008

———————

Before FLAUM, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Hoping to ensure affordable and comprehensive health insurance for their employees, a group of independent funeral directors who own small mortuaries in Indiana got together and created the Indiana Funeral Directors Insurance Trust. The Trust, formed in 1972, in turn administered a multiple insurance employer welfare arrangement (known as a MEWA) to provide health benefits to the employees. Five trustees

administered the Trust, and they hired Benefit Actuaries—which despite its name does not employ any actuaries—to serve as the Trust's third-party administrator, insurance broker, and advisor.

Things were hunky-dory for awhile, but eventually there came a time when the Trust experienced an unexpected spike in claims and ran out of funds to pay them all. In 1997,[1] the Trust sued Benefit Actuaries, claiming that it violated its fiduciary duty under the Employee Retirement Income Security Act of 1972 (ERISA) and that it breached its common-law duties to the Trust by providing it with bad advice and failing to recommend measures that would have staved off insolvency. Magistrate Judge John P. Godich, hearing the case with the consent of the parties, granted summary judgment in favor of Benefit Actuaries on some of the Trust's claims and, after a bench trial, found in favor of Benefit Actuaries on the rest.

The Trust's financial woes can be traced back to 1984, when it decided to self-insure (or self-fund) its health plan. The self-insured plan operated by charging premiums to member funeral directors and using those premiums to cover participant employees' claims. The Trust also could require the funeral directors to make additional payments, known as assessments, if it found itself underfunded. By contrast, a fully funded health insurance plan is purchased from an insurance provider, which in turn shoulders the responsibility of paying participants' claims.

---

[1] This is not a misprint as the litigation is now into its second decade.

Among the risks that self-funded plans bear is the possibility that claims will outstrip premiums, resulting in an inability to pay them all. A trust administering a self-funded plan protects against an unexpected rise in the number and amount of claims by putting aside funds in reserve to be used when premiums are insufficient to cover claims. Additionally, two types of insurance coverage further limit this risk to self-funded plans.

First, to protect against large individual claims, a trust can purchase specific stop loss coverage, which reimburses the trust for any amount that it pays a participant over a deductible, known as the attachment point. Thus, if the attachment point (or deductible) is $50,000 and a participant incurs $75,000 in covered expenses, the specific stop loss insurance policy would reimburse the trust for the last $25,000 paid to the participant. If a trust has a specific stop loss policy, its risk is limited to the deductible multiplied by the number of participants. The lower the deductible, the higher the premiums the trust must pay for coverage. Since a trust would pass this cost on to its members, a low specific stop loss deductible would have the obvious effect of increasing members' premiums.

Second, a trust can purchase aggregate stop loss coverage, which caps the total amount, over all claims, a trust is responsible for paying out. Once a trust's claims exceed the attachment point (or deductible), the aggregate stop loss coverage kicks in and reimburses the trust for claims amounts above the deductible. For example, if a trust had a $1 million deductible but owed $1.2 million in claims reimbursements to participants, the aggregate stop loss coverage would cover the last $200,000. Like specific stop loss coverage, the lower the aggregate stop

loss coverage deductible, the greater the cost of the premiums to purchase the policy.

Benefit Actuaries advised the trustees on how to operate the Trust and manage its risks. In its role as third-party administrator it handled adjustment and payment of claims. It also served as the Trust's insurance broker, procuring the Trust's insurance coverage. Further, it was the Trust's advisor, compiling detailed reports in which it analyzed claims, projected the amount of future claims, and made recommendations as to what premiums to charge, what level of insurance to secure, and how much to keep in reserve. It met yearly with the trustees to report on the status of the Trust and to make recommendations about setting premiums and procuring insurance.

Although Benefit Actuaries set a target reserve level, the Trust did not stick to this goal as a matter of practice. Instead, it kept reserves on a more haphazard basis. If it had a good year, when claims were low, it would hold the excess premiums in reserve; however, if claims were high, it drew down its reserves. But the Trust did maintain specific stop loss coverage. Originally, the deductible was $40,000, but after consultation with Benefit Actuaries the Trust agreed to a higher deductible of $50,000 in 1994 and of $60,000 in 1995. The Trust did not purchase aggregate stop loss coverage.

In the 1990s the Trust began experiencing financial problems. By 1994 it did not have enough funds to pay all of the participants' claims. To meet this problem, Benefit Actuaries advised the trustees to reduce benefits, raise premiums, and make assessments on the funeral directors. The trustees followed this advice, and the Trust stayed afloat. Soon afterward, Benefit Actuaries told the

trustees that the Trust's financial problems and changes in the law would make it difficult for the Trust to continue to operate a self-funded plan, and it suggested that they consider switching to a fully insured plan through Blue Cross Blue Shield. The trustees rejected this advice because Blue Cross Blue Shield would have raised premiums by 50 percent and could not guarantee that it would insure all employees.

So there were hints that the Trust's financial situation was precarious, but the fatal blows were dealt in 1996 and 1997 when an unexpected and unprecedented number of large claims were made against the Trust. In an effort to save the Trust from insolvency, Benefit Actuaries recommended that the Trust raise premiums in the fall of 1996. The trustees agreed and raised the premiums by 21 percent. Again Benefit Actuaries suggested that the trustees look for a fully insured plan. In February 1997 Benefit Actuaries received a quote from Trustmark Insurance Corporation, but because Trustmark would have charged higher premiums than the funeral directors were paying, the trustees again rejected the advice that it switch to a fully insured plan.

In April 1997 the trustees fired Benefit Actuaries. The next day, Jay Matthew, the president of Benefit Actuaries, wrote to one of the trustees warning that, despite the premium increase, the Trust remained underfunded. Matthew advised that, to maintain an adequate level of reserves, the trustees would have to increase premiums by an additional 41 percent and implement a three-month assessment on the funeral directors. The trustees did not follow this advice.

Later in 1997 the situation became dire, and it was evident that the Trust was heading towards insolvency.

The trustees finally decided to switch to a fully insured plan. The Trust stopped accepting claims in September 1997, but the unpaid claims exceeded the funds in the Trust. The trustees and the Indiana Funeral Directors Association established a settlement fund to pay the remaining claims, but after the fund was exhausted the Trust still owed over $100,000 to medical providers, employees, and funeral directors.

In its suit, the Trust alleged that Benefit Actuaries violated its fiduciary duty under ERISA and negligently failed to provide competent advice. Both Benefit Actuaries and the Trust moved for summary judgment. Judge Godich denied the Trust's motion and granted in part Benefit Actuaries' motion. The judge then permitted the Trust to amend its complaint to add new state-law claims, including that Benefit Actuaries had assumed a duty to provide competent actuarial services consistent with Michigan MEWA laws.

Again the parties cross-moved for summary judgment. As evidence that Benefit Actuaries assumed a duty to act in accordance with Michigan law, the Trust submitted deposition testimony from Mr. Matthew that the company follows Michigan's MEWA regulations. The judge denied the Trust's motion and granted in part Benefit Actuaries's motion. He found that Matthew's deposition testimony was merely a general description of how Benefit Actuaries, a Michigan company, conducts business and that, in any event, the Trust had put forward no evidence that it relied on Benefit Actuaries to comply with Michigan law. Thus, he concluded that the Trust could not establish that Benefit Actuaries assumed a duty to administer the Trust in accordance with the Michigan MEWA statute. The judge did allow the Trust to

proceed to trial on its claims that Benefit Actuaries breached its duty to set appropriate claims reserves and to obtain adequate insurance coverage; however, he limited the types of damages the Trust could attempt to prove.

After the bench trial, Judge Godich found in favor of Benefit Actuaries. He determined that Benefit Actuaries had a duty to advise the trustees "with the degree of care or skill exercised or possessed by other professionals engaged in advising and administering self-insured plans under similar circumstances" and concluded that Benefit Actuaries had not breached this duty. After first finding that Benefit Actuaries was not to blame for the Trust's failure to obtain aggregate stop loss coverage, a determination the Trust does not dispute on appeal, the judge next concluded that Benefit Actuaries did not breach the standard of care in advising the Trust to raise the specific stop loss deductible in 1994 and 1995. He based this finding on his evaluation of the testimony of two expert witnesses.

The Trust's expert testified that by 1994 the Trust was in a "death spiral," which occurs when healthy participants abandon a plan for less expensive options and leave behind only those who incur claims greater than their share of the premiums paid in. He further explained that the appropriate response to a death spiral is to reduce the specific stop loss deductible and thus concluded that Benefit Actuaries' recommendation that the Trust increase the deductible was improper. The judge, however, credited the testimony of Benefit Actuaries' expert, who opined that Benefit Actuaries' advice to raise the deductible was sound. This expert calculated that, based on the amount of expected claims, the appropriate

specific stop loss deductible was between $50,000 and $80,000, and thus it was acceptable to raise the deductible to $50,000 in 1994 and $60,000 in 1995. Furthermore, the judge credited the testimony of Benefit Actuaries' president that, although the plan was losing participants in 1994, it was not in a death spiral because the employees leaving the plan were a heavier drain on the Trust's resources than those who remained.

The judge then analyzed whether Benefit Actuaries breached its duty to advise the Trust about setting appropriate reserves. He determined that it failed to recommend that the Trust set aside adequate reserves and instead considered reserve levels as a "loose target, not as a firm goal." But the judge also found that the trustees did not express concern when reserves fell below the target level Benefit Actuaries tried to achieve. Furthermore, the judge concluded, the trustees were highly tolerant of risk and did not wish to operate with substantial reserves because increasing reserves would impair their priorities of making health care affordable and available to all employees. The trustees had enough financial knowledge to understand the risk of maintaining minimal reserves. So, the judge concluded, Benefit Actuaries was not responsible for the Trust's paltry reserves.

Finally, the judge refused to credit the testimony of the trustees that, had Benefit Actuaries told them before 1997 that the Trust was in dire financial straits, they would have terminated it. Instead, he concluded that, even if Benefit Actuaries had advised the trustees to terminate the Trust before 1997, the trustees would have ignored the advice because a fully insured plan was too expensive and would not have covered all employees. The judge acknowledged that, as it turned out, Benefit Actuaries

advised the Trust poorly, but he concluded that its advice did not fall below the standard of care because it based its advice on the trustees' high level of risk tolerance. In any event, the judge concluded, the Trust had failed to prove damages.

On appeal, the Trust first argues that the judge erred in granting summary judgment on its claim that Benefit Actuaries assumed the duty to comply with Michigan law, or at least to perform competent actuarial services. We review the ruling granting summary judgment *de novo*, viewing all facts in the light most favorable to the Trust. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). We note, however, that the Trust supports its argument in part with citations to trial testimony, but we have disregarded this evidence because we can consider only what was before the judge at the summary judgment stage. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1024-25 (7th Cir. 2003).

Every MEWA that operates in Michigan is obligated to, among other things, file annual actuarial reports on its financial condition and maintain a minimum level of cash reserves. *See* MICH. COMP. LAWS ANN. § 500.7040(1)(a), (c). Indiana did not adopt similar regulations for MEWAs until 2003, over five years after the Trust became insolvent. Although the MEWA here operated only in Indiana and thus was not subject to the Michigan regulations, the Trust insists that Benefit Actuaries assumed a duty to comply with these rules. We have interpreted Indiana law (which the parties agree controls their dispute) to apply a three-part test to determine whether a defendant has assumed a duty. *See Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 744 (7th Cir. 1999); *Roe v. Sewell*, 128 F.3d 1098, 1104 (7th Cir. 1997). First, the defendant must

have promised or otherwise agreed to undertake a duty. *Holtz*, 185 F.3d at 744. Second, the defendant had to know that the plaintiff would rely on the assumption of the duty. *Id*. Third, if the plaintiff is claiming misfeasance, the defendant must have taken some affirmative action, or, if the plaintiff is claiming nonfeasance, there must have been detrimental reliance. *Id.*

We agree with Judge Godich that the Trust did not put forward any evidence that Benefit Actuaries promised to administer the Trust in accordance with Michigan's MEWA law or that Benefit Actuaries knew the Trust would rely on it to follow the Michigan statute. The Trust points to a single mention of a "Commissioner," which, it argues, refers to Michigan's Insurance Commissioner, in its contract with Benefit Actuaries, and to Matthew's deposition testimony that Benefit Actuaries operated consistently with Michigan law, as evidence that creates a genuine issue of material fact about whether Benefit Actuaries agreed follow Michigan's MEWA law in administering the Trust. But the contract between Benefit Actuaries and the Trust does not mention Michigan law, and the vague reference to the "Commissioner" does not raise a triable issue as to whether Benefit Actuaries agreed to abide by Michigan law. Nor does Matthew's deposition testimony explaining generally that the company operates under the MEWA law create an issue of fact. Although Benefit Actuaries, as a Michigan company, must comply with Michigan law when necessary, nothing in Matthew's testimony reflects that Benefit Actuaries agreed to follow Michigan law when administering this Indiana trust. And even if Benefit Actuaries had promised to undertake obligations under Michigan law, the Trust presented no evidence that Benefit Actuaries knew the

Trust would rely on that promise. To the contrary, the Trust concedes in its brief that it "may not have relied upon Benefit Actuaries to adhere to Michigan's MEWA statutes directly."

The Trust goes on to argue, however, that at the very least Benefit Actuaries assumed the duty to provide competent actuarial advice. But the evidence the Trust submitted on summary judgment does not support this conclusion. The Trust presented no evidence that Benefit Actuaries, despite its name, promised to act as an actuary for the Trust. Instead, the evidence showed that Benefit Actuaries undertook to act as the third-party administrator, insurance broker, and advisor for the Trust, and nothing suggests that these services required actuarial expertise. At most, the Trust's evidence established that Benefit Actuaries might have referred to actuarial tables in performing its analyses. But this is not enough to create a triable issue as to whether Benefit Actuaries promised to assume the duties of an actuary, and much less whether the Trust relied on this promise.

The rest of the Trust's arguments fault the determination made by the judge after the bench trial that Benefit Actuaries did not breach its duty to provide competent services as a third-party administrator, insurance broker, and advisor. Whether a particular act or omission constitutes a breach of the duty of care is generally a question of fact. *See N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003). And we will overturn factual determinations, as well as the application of the law to the facts, only if they are clearly erroneous. *See Trs. of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 785 (7th Cir. 2007). We defer to the

judge's credibility determinations, *see Murdock & Sons Constr., Inc. v. Goheen Gen. Constr., Inc.*, 461 F.3d 837, 840 (7th Cir. 2006), and if there are multiple ways to view the evidence, the judge's choice of one interpretation over others cannot be clearly erroneous; so, we will not reverse a factual finding as long as it is plausible in light of the record, *see Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006).

The Trust first argues that it was clearly erroneous for the judge to conclude that Benefit Actuaries did not breach its duty by recommending that the Trust adopt a higher specific stop loss deductible in 1994 and 1995. The Trust relies on the testimony of its expert that, when Benefit Actuaries recommended the Trust raise the deductible, the Trust was in a death spiral, and so the only reasonable advice would have been to lower the deductible, or at least to maintain it at its then-current level. But there was also ample evidence to support a contrary determination. Benefit Actuaries' president disagreed with the Trust's expert and testified that the death spiral did not begin until 1997. Furthermore, Benefit Actuaries' expert concluded that the deductible Benefit Actuaries chose and that the Trust adopted was reasonable. The judge explained that he credited the testimony of Benefit Actuaries' expert because his conclusion was based on specific calculations and was consistent with the level of risk tolerance the Trust historically had shown. He also relied on evidence that maintaining a low deductible would have increased premiums to the funeral directors, a result the judge determined was at odds with the priorities of the Trust. The judge therefore chose one plausible interpretation of the evidence over another, and his choice was not clearly erroneous.

The Trust next argues that the judge clearly erred in finding that Benefit Actuaries did not breach its duty by failing to advise the trustees about the risk of raising the specific stop loss deductible and about the Trust's poor financial situation. The trustees testified that Benefit Actuaries did not support its recommendations with sufficient analyses and that, if they had known sooner how dire the Trust's financial situation was, they would have terminated the Trust earlier. But the judge found this testimony incredible. He concluded that the trustees had enough financial acumen to understand the trade-offs associated with choosing a higher deductible. In effect, they knew they were choosing more affordable coverage in exchange for accepting greater financial risk. Furthermore, he pointed out that, when faced with financial problems, the trustees often refused to follow Benefit Actuaries' advice if it would have resulted in increased cost to funeral directors or decreased coverage to employees. He noted that the Trust twice declined to transition to a fully insured plan and decided not to raise premiums and make assessments as the Trust's financial situation deteriorated in 1997. He found that the trustees had a high tolerance for risk and that they valued availability and affordability of medical benefits above ensuring the Trust's long-term financial stability. It was not clearly erroneous for Judge Godich to conclude that, knowing the requirements of its clients, Benefit Actuaries did not breach its duty by failing to continually sound the alarm that the sky was falling.

The Trust next argues that the judge erred when he rejected its contention that Benefit Actuaries breached a duty by failing to recommend that the Trust maintain adequate reserves. Specifically, it points to the judge's

finding that Benefit Actuaries recommended reserve levels based on a "loose target, not as a firm goal," and argues that this finding compels the conclusion that Benefit Actuaries breached its duty to the Trust. We agree that some evidence supports the view that Benefit Actuaries should have provided the trustees with more advice about the dangers of a fly-by-the-seat-of-your-pants approach to reserves. But the evidence does not compel this conclusion, and there is sufficient support in the record for the judge's finding that maintaining a steady level of reserves was not a priority for the Trust. The judge based his determination on the testimony of the trustees and Benefit Actuaries' officers about the relationship of the parties and the trustees' history of declining to follow the advice of Benefit Actuaries when doing so would have increased the cost to the member funeral directors or excluded some employees from coverage. He further found that the trustees' confidence in their risky strategy had been affirmed by the Trust's recovery from its financial problems in 1995 despite its lack of adequate reserves. The judge considered the totality of the evidence before him and reached a plausible conclusion.

Finally, the Trust argues that the judge improperly limited the types of damages it could attempt to prove at trial. But we need not address this issue because we conclude the judge did not err in finding that Benefit Actuaries breached no duty to the Trust. Without a breach, the Trust is not entitled to damages.

Therefore, the judgment is AFFIRMED.