NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 8, 2014
Decided October 20, 2014

**Before**

RICHARD A. POSNER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 14-1582

| | |
|---|---|
| JAN NEWELL, | Appeal from the United States District |
|     *Plaintiff–Appellant,* | Court for the Northern District of Illinois, |
| | Western Division. |
|     *v.* | |
| | No. 06 C 50137 |
| LAWRENCE NGU, | |
|     *Defendant–Appellee.* | Frederick J. Kapala, |
| | *Judge.* |

**O R D E R**

    Jan Newell, a former inmate at Dixon Correctional Center, is a paraplegic and requires the use of a catheter. He brought this action under 42 U.S.C. § 1983 claiming that Dr. Lawrence Ngu, a past medical director at Dixon, was deliberately indifferent to his recurring urinary tract infections, which resulted from the failure to timely and properly replace his catheter. The district court entered summary judgment for Dr. Ngu, reasoning that a jury could not find from the evidence that he was responsible for changing Newell's catheter—that was the nurses' job—or that he knew that catheter replacements were being delayed. Although we conclude that there is evidence that Dr. Ngu was aware Newell's catheter was not being replaced regularly, we affirm the

judgment because a jury could not reasonably find from the evidence that Dr. Ngu was personally responsible for those delays.

Dr. Ngu worked at Dixon from 2004 to 2009 as an employee of Wexford Health Sources, Inc., first as a staff physician and then, beginning in 2005, as the medical director. As medical director, Dr. Ngu treated inmates and submitted requests to prison administrators for off-site medical care. He typically reviewed the reports of inmates' off-site treatment; if he disagreed with the off-site doctor's recommendation, he would discuss his disagreement with the inmate and with his superiors at Wexford.

Newell already was paraplegic when he arrived at Dixon in 1996 after being convicted of murder in Illinois. (He was paroled in May 2013.) Newell requires a catheter because he lacks bladder control. In 2004, Dixon medical staff switched him from an external catheter to an internal (or "indwelling") catheter to alleviate his recurring urinary tract infections. But those infections persisted, and from 2004 through 2007, Newell submitted several grievances complaining that Dixon medical staff were not timely or properly replacing his catheter.

Because of his infections and other urological problems, Newell received off-site medical treatment at the University of Illinois at Chicago Medical Center in May 2005, January 2006, June 2006, and August 2007. The treatment reports from those visits show that, after the 2005 and 2006 visits, a urologist recommended that Newell's catheter be changed monthly. The urologist also noted in the June 2006 report that Newell's catheter had been improperly placed the week before. Dr. Ngu reviewed the June 2006 report and approved the urologist's recommendation that Newell's catheter be changed monthly.

Newell filed this suit in July 2006. In his amended complaint (drafted by appointed counsel in February 2007), Newell alleged that Dr. Ngu was responsible for his medical care, that Dr. Ngu knew his health was at risk because of delayed and improper catheter changes, and that Dr. Ngu did nothing about this inadequate medical care.

In July 2013, Dr. Ngu moved for summary judgment. He argued that he was not liable for any harm resulting from the delayed replacements of Newell's catheter because the nurses at Dixon were responsible for changing catheters and he did not "supervise" the nurses or other members of the medical staff. Dr. Ngu submitted as evidence a transcript of his deposition, during which he had testified that his job was

"more of an administrative position," that he did not "supervise[] the medical care provided by" other providers at Dixon, that he did not supervise the nursing staff "directly," and that, at most, he "maybe [supervised the] director of nursing, if need be." He also submitted transcripts of the depositions of other members of Dixon's medical staff: Dr. Brian LaMere, Dr. Rajender Dahiya, and physician's assistant Eva Colgan Valdez. Dr. Dahiya and Colgan Valdez both had testified that it was the nurses' job to change catheters. Colgan Valdez had testified also that the "protocol" was to wait "30 days unless directed otherwise" before changing an indwelling catheter. Finally, Dr. Ngu submitted a report from Newell's medical records showing that he had approved the urologist's June 2006 recommendation to change Newell's catheter monthly.

Newell opposed Dr. Ngu's motion on the grounds that a jury could find from the evidence that he knew the catheter wasn't being changed monthly and because he "was the healthcare official responsible for approving the location and frequency of Plaintiff's catheter changes." As evidence of Dr. Ngu's knowledge, Newell submitted his own deposition testimony and documents related to a grievance he filed in May 2007. Newell had testified at his deposition that "on numerous occasions" he told Dr. Ngu that his "catheter had to be changed because it had been too long," that Dr. Ngu responded by promising to schedule a catheter change, and that later "somebody else" told him he "wasn't scheduled" for a catheter change. In the May 2007 grievance, Newell complained that his catheter wasn't changed from December 27, 2006, to April 28, 2007, and that the nurses who finally changed the catheter had tried several times before succeeding, which resulted in bleeding. Newell requested in the grievance "that all future catheter changes be done by off-site urologists in a timely fashion." That grievance was forwarded to the healthcare administrator, who apparently replied that Newell was refusing, without basis, to allow Dixon staff to change his catheter. The grievance officer "encouraged" Newell to let the staff change his catheter and stated that a copy of the grievance would be forwarded to Dr. Ngu.

In support of his contention that Dr. Ngu was responsible for ensuring timely catheter changes, Newell pointed to Dr. Ngu's testimony that, as the medical director, his duties at Dixon were "the day-to-day management of patient care, as well as a supervisory position of medical staff, physicians, [and a] physician assistant." Newell did not provide, however, any evidence defining Dr. Ngu's supervisory duties. Newell cited his own testimony that the "nurses and doctors were all taking turns changing the catheter," as well as Dr. Ngu's testimony that catheter changes were documented by the nurse or other staff member who changed the catheter. Colgan Valdez, the physician's

assistant, also had testified that on one occasion she changed Newell's catheter and that she worked under Dr. Ngu's supervision and control. Newell also relied on Dr. LaMere's testimony that off-site treatment had to be approved by the medical director and that the medical director could override doctors' orders for catheter changes if he felt that the catheter changes were unnecessary.

Newell's evidence further included the reports from his off-site consultations in May 2005, January 2006, and June 2006 recommending that his catheter be changed monthly, and a report from June 2007 stating that Newell had received surgery to fix a narrowing of the urethra. Dr. Ngu had conceded at his deposition that his signature on the reports from June 2006 and 2007 "likely" meant that he had reviewed those reports. Newell also submitted a one-page self-prepared document titled "Chronological History of Catheter Changes," which lists the dates of his catheter changes from August 2004 through April 2009 and gives the average time between changes as "80 days (2.66 months)." But Newell submitted no evidence that Dr. Ngu did not, as he had promised, tell the staff to change the catheter or that he directed them not to do so.

Finally, Newell submitted a three-page letter from Dr. Donald Feeney, a urologist who had reviewed Newell's medical records (he does not say which ones) and concluded that he had suffered "significant and permanent reduced kidney function" as a direct result of inadequate care for his bladder condition, including the failure to change the catheter monthly. As further evidence of harm, Newell cited his own testimony that the delayed and improper catheter changes caused frequent urinary tract and other infections, pain and discomfort, resistance to antibiotics, and heart problems.

Dr. Ngu replied that he was entitled to summary judgment because Newell's evidence does not show he was "directly involved with the claimed constitutional violation." He also advanced two procedural arguments: that the district court should ignore Newell's proposed "additional facts" because his submission does not comply with Local Rule 56.1 of the Northern District of Illinois, and that the court should disregard Dr. Feeney's letter because he had not been disclosed as an expert witness, *see* FED. R. CIV. P. 26(a)(2). Dr. Ngu further maintained that Newell's Chronological History of Catheter Changes lacks a foundation and thus is inadmissible.

In granting summary judgment for Dr. Ngu, the district court assumed that Newell's bladder condition constituted a serious medical need but asserted that the plaintiff failed to submit any "evidence that Dr. Ngu was aware of any deprivation, let alone any evidence to show that he approved of or condoned the alleged deprivation."

The court acknowledged that the grievance records submitted by Newell establish that Dr. Ngu knew about delays in changing Newell's catheter during mid-2007. But that awareness was irrelevant, the court reasoned, because Newell's first amended complaint covered only events *before* it was filed in February 2007. (The court noted that in December 2009 Newell had passed up a chance to amend his complaint a second time.) The court implicitly rejected Dr. Ngu's evidentiary objections, stating that it had considered everything the parties had submitted, including the Chronological History of Catheter Changes. (Although agreeing with Dr. Ngu that Newell had not laid a foundation for his chronological history, the court nonetheless considered that submission because its accuracy was unchallenged and because it did not affect the court's analysis.) The court further acknowledged that the urologist's report from June 2006, which Dr. Ngu had signed, showed that he knew that a urologist had recommended monthly catheter replacements. But, the court reasoned, Dr. Ngu had *approved* this recommendation, and, according to the court, Newell had submitted "no evidence to suggest" that Dr. Ngu was aware before this lawsuit that the urologist's recommendation was not being followed.

Newell appeals the district court's judgment. To avoid summary judgment, however, Newell had to produce evidence from which a reasonable jury could find that he suffers from an objectively serious medical condition, that Dr. Ngu knew about but consciously disregarded that condition, and that he was harmed as a result. *See Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

As a preliminary matter, we note that Dr. Ngu has never disputed that Newell's bladder condition was objectively serious. He does dispute the element of causation, but that contention is weak. Dr. Ngu continues to maintain that Dr. Feeney's letter is inadmissible because Newell had not disclosed Dr. Feeney as an expert witness. Dr. Ngu does not say whether he is objecting to the content or form of the disclosure, or to its timing. As best we can tell, he is objecting to the timing, but that objection is without merit because there was no agreed or court-ordered deadline for the disclosure of expert witnesses. *See* FED. R. CIV. P. 16(b)(3)(B)(i), 26(a)(2)(D). Absent a contrary agreement or court order, a disclosure of expert testimony is timely so long as it occurs at least 90 days before trial. FED. R. CIV. P. 26(a)(2)(D); *Griffin v. Foley*, 542 F.3d 209, 213 n.7 (7th Cir. 2008). Newell's disclosure satisfies this requirement.

We also reject Dr. Ngu's contention on appeal that Newell's testimony that he was harmed by the delayed catheter changes should have been disregarded because the

plaintiff lacks "medical training." Lack of medical expertise might prevent Newell from giving an opinion on causation, but it doesn't render inadmissible his testimony that he suffered from recurring urinary tract infections and experienced pain and discomfort during the extended period that his catheter was not being changed properly. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011). A jury reasonably could infer that Newell's infections and pain resulted from the lack of appropriate attention to his catheter, a conclusion that seems frivolous to dispute given the extensive medical records of treatment for infections and Dr. Feeney's opinion. *See Roe v. Elyea*, 631 F.3d 843, 864–65 (7th Cir. 2011); *Williams v. Liefer*, 491 F.3d 710, 715–16 (7th Cir. 2007); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004).

The critical issue is whether the evidence submitted at summary judgment would permit a jury reasonably to find that Dr. Ngu bore responsibility for the delayed catheter changes. For a supervisor like Dr. Ngu to be liable under § 1983, he must be "personally responsible" for the constitutional deprivation, which means that he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (citations and quotation marks omitted).

Proof of Dr. Ngu's knowledge is not the concern. As Newell contends, his evidence shows that Dr. Ngu knew the catheter was not being changed monthly. Newell testified during his deposition that he told Dr. Ngu "on numerous occasions" that his catheter needed changing "because it had been too long." Dr. Ngu does not dispute that this testimony supplies sufficient evidence of his personal knowledge.

Still, proof of knowledge is not evidence of *inaction* or, worse, *interference*. The nurses, not Dr. Ngu, changed catheters, and not a single nurse has said that Dr. Ngu encouraged their delays or even that he failed to say anything when told about those delays. In fact, it's not even clear from this record that Newell's lawyer *asked* the nurses to explain the delays. When we inquired at argument whether Newell's lawyer had deposed any nurses, counsel answered *yes* but did not explain why transcripts of these depositions were not submitted at summary judgment. This gap in the evidence dooms Newell's contention that "Dr. Ngu failed to implement the recommendation for monthly catheter changes."

Newell does not dispute that the "protocol" was to change indwelling catheters at least every 30 days "unless directed otherwise." There is no evidence that Dr. Ngu directed anyone to do otherwise; to the contrary, in June 2006 he *approved* the urologist's

recommendation that Newell's catheter be changed once a month, thus reinforcing the established protocol.

True, Newell testified that catheter changes still were not scheduled after he had told Dr. Ngu about the delays. From this Newell concludes that Dr. Ngu was responsible for the scheduling failure, but that conclusion is not reasonable. No evidence explains *why*, if changing catheters monthly was the policy at Dixon and already had been approved for Newell by Dr. Ngu, the delays nonetheless continued. Although Dr. LaMere's deposition testimony establishes that doctors can order catheter changes, there is no evidence—such as a Wexford policy manual or testimony from a member of the medical staff—of how a catheter change is scheduled. Indeed, when we asked counsel at argument to identify any such evidence, he could not do so.

It also is not clear what Dr. Ngu could have done about the scheduling failure, given his testimony that his job was "more of an administrative position" and that he did not "directly" supervise the nursing staff. *See Smego v. Mitchell*, 723 F.3d 752, 758 (7th Cir. 2013) (affirming summary judgment against prisoner on claim that medical director was deliberately indifferent for failing "to obtain medical supplies for the dental unit" because there was no evidence that medical director "had control over the dental unit's purported problems with supplies and broken equipment"); *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002). In short, Newell simply speculated that the scheduling failure was caused by Dr. Ngu's inaction rather than the inaction of a nurse, a physician's assistant, another doctor, or some clerical employee. And speculation cannot defeat a motion for summary judgment. *See Matthews v. Waukesha Cnty.*, 759 F.3d 821, 824 (7th Cir. 2014).

Newell also argues that Dr. Ngu was deliberately indifferent because he did not send Newell *off-site* to have the catheter changes performed properly.[1] Newell did not make this argument in the district court, but Dr. Ngu does not contend that the argument is waived, so this court can address it. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003); *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 790 (7th Cir. 1999). But although Dr. Ngu could submit requests for off-site medical care, there is no evidence that Dr. Ngu knew that off-site catheter changes were necessary. Newell points to a urologist's report from July 2006, which

---

[1] According to physician's assistant Colgan Valdez, Dixon eventually did send Newell off-site for catheter changes. Colgan Valdez didn't recall when this change occurred, but it was several years before her deposition in December 2012.

states, "Recommend [patient] come to clinic for catheter changes as he reports that Dixon is unable to do so properly and leaves it in for longer than a month." We cannot consider this evidence, however, because it was not before the district court at summary judgment. *See Ind. Funeral Dirs. Ins. Trust v. Benefit Actuaries, Inc.*, 533 F.3d 513, 518 (7th Cir. 2008).

**AFFIRMED**.